**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUN 07 2010

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS

JAMES W. McCORMACK, CLERK
.By:_____
_____ DEP CLERK

Nuveen High Yield Municipal Bond Fund, a series of the Nuveen Municipal Trust, a Massachusetts business trust,

Nuveen Municipal High Income Opportunity Fund, a Massachusetts business trust,

Nuveen California High Yield Municipal Bond Fund, a series of Nuveen Multistate Trust II, a Massachusetts business trust,

Nuveen Preferred Securities Fund, a series of the Nuveen Investment Trust V, a Massachusetts Business Trust,

and

Pacific Specialty Insurance Company, a California insurance company.

### PLAINTIFFS

v.

Crews & Associates, Inc., an Arkansas corporation,

First Security Bancorp, an Arkansas corporation, and

Joseph Parrott Bumpers, David Paul Crews, Rush Flowers Harding, III, Donald T. Jack, Jr., James Stephen Jones, Reynie Rutledge, Donald Ray Winton, and J. Richard Williams, individuals.

### DEFENDANTS

Case No. 4:10-CV-548 JLH

Section _____

Judge _____

Magistrate Judge _____

This case assigned to District Judge Holmes
and to Magistrate Judge Volpe

{00231644.DOC; 3}

## COMPLAINT AND JURY DEMAND

Plaintiffs Nuveen High Yield Municipal Bond Fund, Nuveen Municipal High Income Opportunity Fund, Nuveen California High Yield Bond Fund, Nuveen Preferred Securities Fund (the "Plaintiff Bond Funds") and Pacific Specialty Insurance Company ("Pacific"), by their attorneys, Emerson Poynter, L.L.P., Davis & Ceriani, P.C. and Sher Garner Cahill Richter Klein & Hilbert, L.L.C. for their Complaint against Defendants Crews & Associates, Inc., First Security Bancorp, Joseph P. Bumpers, David P. Crews, Rush F. Harding III, Donald T. Jack, Jr., James S. Jones, Reynie Rutledge, Donald R. Winton and J. Richard Williams, state as follows:

### JURISDICTION AND VENUE

1.     Jurisdiction exists by virtue of diversity of citizenship pursuant to 28 U.S.C. § 1332 as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

2.     Venue of this action lies in this Court pursuant to 28 U.S.C. § 1391(b) because certain Defendants are subject to personal jurisdiction in this Court at the time this action is commenced.

### SUMMARY OF COMPLAINT

3.     The Carter Plantation planned community development ("Carter Plantation") is a 550-acre real estate development located in Livingston Parish, Louisiana that was financed in large part through the sale of municipal bonds and notes purchased by the Plaintiffs.

4.     Defendant Crews & Associates, Inc. ("Crews") is a broker-dealer and investment banking firm that served as the underwriter of what will be referred to throughout this Complaint as the "Hotel Bonds" and the "Marina Bonds" and served as the placement agent for what will be referred to as the "Taxable Notes."

5.     Crews prepared disclosure documents called a Preliminary Official Statement ("POS") and Official Statement ("OS") (collectively "Official Statements") for the Hotel Bonds, prepared a disclosure document called a Limited Offering Memorandum ("LOM") for the Marina Bonds and prepared a disclosure document called a Private Placement Memorandum ("PPM") for the "Taxable Notes."

6.     Defendant Richard Williams ("Williams") was a Louisiana-based employee of Crews and an investment banker.  Williams was primarily responsible for the underwriting, placement and sales activities of Crews with respect to the Hotel and Marina Bonds and the Taxable Notes.  In addition, Williams actively participated in the operations of Crews alleged in this Complaint and possessed actual control over the actions of Crews which form the basis for this Complaint.

7.     Defendant First Security Bancorp is a privately held Arkansas based state bank ("First Security") and is the parent corporation and sole shareholder of Crews.  First Security selected the board of directors of Crews.  First Security, the board of directors of Crews and the officers of Crews actively participated in the operations of Crews alleged in this Complaint and possessed actual control over the actions of Crews that form the basis for this Complaint.

8.     Crews, acting with the knowledge, consent and approval of First Security and the officers and directors of Crews, offered and sold the Hotel and Marina Bonds and offered the Taxable Notes to the Plaintiffs.

9.     The Hotel and Marina Bonds and the Taxable Notes are securities.  As an underwriter, offeror and seller of securities, Crews was required to make, and the Plaintiffs were entitled to receive, truthful, accurate and complete disclosure of all material facts in the Official Statements, PPM and LOM.  The Plaintiffs purchased Hotel and Marina Bonds and Taxable Notes in reasonable reliance on the Official Statements, PPM and LOM.

10.    As alleged in more detail below, Crews and Williams negligently misrepresented and failed to disclose material facts in Official Statements, PPM and LOM in violation of tort law and the state securities acts of Louisiana, Illinois and Arkansas.  The directors and officer of Crews and Williams are liable as controlling persons under the state securities acts.

## PARTIES

11.    Plaintiff Nuveen High Yield Municipal Bond Fund is a series of the Nuveen Municipal Trust, a Massachusetts Business Trust and mutual fund, which, at all times pertinent to this Complaint, maintained its principal place of business in Chicago, Illinois and, acting through its investment advisor, Nuveen Asset Management, Inc. ("NAM"), purchased Hotel and Marina Bonds and Taxable Notes as follows:

| Hotel Bonds | Settlement Date | Amount Purchased | Purchase Price | Amount Paid |
|---|---|---|---|---|
| | 08/30/2006 | 11,435,000 | 100.000 | 11,435,000 |
| | 08/30/2006 | 2,265,000 | 100.000 | 2,265,000 |

|  | 01/25/2007 | 100,000 | 101.250 | 101,250 |
|---|---|---|---|---|

| Taxable Notes | Purchase Date | Amount Purchased | Purchase Price | Amount Paid |
|---|---|---|---|---|
|  | 06/08/2007 | 10,455,000 | 100.000 | 10,455,000 |

| Marina Bonds | Settlement Date | Amount Purchased | Purchase Price | Amount Paid |
|---|---|---|---|---|
|  | 09/27/2007 | 12,695,000 | 100.000 | 12,695,000 |

12.     Plaintiff Nuveen High Yield Municipal Bond Fund still owns the Hotel Bonds and Taxable Notes but sold the Marina Bonds as follows:

| Amount Paid | Sell Date | Sales Price | Amount Received |
|---|---|---|---|
| 12,695,000 | 12/23/2008 | 59.39 | 7,539,560 |

13.     Plaintiff Nuveen Municipal High Income Opportunity Fund is a Massachusetts Business Trust and a municipal bond mutual fund which, at all times pertinent to this Complaint, maintained its principal place of business in Chicago, Illinois and, acting through its investment advisor, NAM, in Chicago, Illinois, purchased the Hotel and Marina Bonds as follows:

| Hotel Bonds | Purchase Date | Amount Purchased | Purchase Price | Amount Paid |
|---|---|---|---|---|
|  | 08/30/2006 | 1,000,000 | 100.00 | 1,000,000 |
| Marina Bonds | 09/27/2007 | 1,000,000 | 100.000 | 1,000,000 |

14.   Plaintiff Nuveen Municipal High Income Opportunity Fund still owns the

Hotel Bonds but sold the Marina Bonds as follows:

| Amount Paid | Sell Date | Sales Price | Amount Received |
|---|---|---|---|
| 1,000,000 | 12/23/2008 | 59.39 | 593,900 |

15.   Plaintiff Nuveen California High Yield Municipal Bond Fund is a series of

Nuveen Multistate Trust II, a Massachusetts Business Trust and municipal bond mutual

fund, which, at all times pertinent to this Complaint, maintained its principal place of

business in Chicago, Illinois and, acting through its investment advisor, NAM, purchased

the Hotel Bonds as follows:

| Purchase Date | Amount Purchased | Purchase Price | Amount Paid |
|---|---|---|---|
| 08/30/2006 | 100,000 | 100.000 | 100,000 |

16.   Plaintiff Nuveen Preferred Securities Fund is a series of the Nuveen

Investment Trust V, a is a Massachusetts Business Trust and mutual fund, which, at all

times pertinent to this Complaint, maintained its principal place of business in Chicago,

Illinois and, acting through its investment advisor, NAM, purchased the Taxable Notes as

follows:

| Purchase Date | Amount Purchased | Purchase Price | Amount Paid |
|---|---|---|---|
| 06/08/2007 | 200,000 | 100.000 | 200,000 |

17.    The Nuveen High Yield Municipal Bond Fund, Nuveen Municipal High Income Opportunity Fund, Nuveen California High Yield Bond Fund and Nuveen Preferred Securities Fund are referred to collectively as the "Nuveen Funds."

18.    Plaintiff Pacific Specialty Insurance Company ("Pacific") is a California insurance company with a principal place of business in Menlo Park, California which, acting through its investment advisor, NAM, in Chicago, Illinois purchased the Hotel Bonds as follows:

| Purchase Date | Amount Purchased | Purchase Price | Amount Paid |
|---|---|---|---|
| 08/30/2006 | 100,000 | 100.000 | 100,000 |

19.    Defendant Crews & Associates, Inc. is an Arkansas corporation, broker-dealer and investment banking firm with its principal place of business in Little Rock, Arkansas.  Crews was the underwriter of the Hotel and Marina Bonds and, acting in that capacity, offered and sold the Hotel and Marina Bonds to the Plaintiffs as alleged above in Chicago, Illinois.  Crews acted as the placement agent for the Taxable Notes and, acting in that capacity, offered the Taxable Notes to the Plaintiffs as alleged above in Chicago, Illinois.

20.    Defendant First Security Bancorp is a privately held Arkansas state bank with its principal place of business in Searcy, Arkansas.  At all times pertinent to this Complaint, First Security Bancorp was the parent corporation and sole shareholder of Crews.  First Security appointed the board of directors of Crews, actively participated in

the operations of Crews, and possessed actual control over the operations of Crews which form the basis for this Complaint.

21.    At all times pertinent to this Complaint, Defendant J. Richard Williams was a resident of Baton Rouge, Louisiana, was an employee of Crews and held the title of "Director" of Crews.   Williams was Crews' investment banker who was primarily responsible for the underwriting, placement activities and sales of Crews with respect to the Hotel and Marina Bonds and the Taxable Notes.  Williams acted at all times in the course and scope of his employment with Crews.  Williams actively participated in the operations of Crews, and possessed actual control over the operations of Crews which form the basis for this Complaint.

22.    At all times pertinent to this Complaint, Defendant Joseph P. Bumpers ("Bumpers") was a resident of Arkansas and served as the Chief Financial Officer of Crews.

23.    At all times pertinent to this Complaint, Defendant David P. Crews ("DP Crews") was a resident of Arkansas and served as the Executive Vice President of Crews.

24.    At all times pertinent to this Complaint, Defendant Rush F. Harding ("Harding") was a resident of Arkansas, served as the Chief Executive Officer of Crews, served on the board of directors of Crews and was a member of the Executive and Capital Committees of Crews.

25.    At all times pertinent to this Complaint, Defendant Donald T. Jack ("Jack") was a resident of Arkansas and served as a Director and a member of the Capital Committee of Crews.

26.    At all times pertinent to this Complaint, Defendant James S. Jones ("Jones") was a resident of Arkansas and served as President of Crews, served on the board of directors of Crews, and was the Chief Compliance Officer of Crews.

27.    At all times pertinent to this Complaint, Defendant Reynie Rutledge ("Rutledge") was a resident of Arkansas and served as the Chairman of the Board of Directors of Crews, and was a member of the Executive and Capital Committees of Crews.  At all times pertinent to this Complaint, Rutledge also served as the Chairman and Chief Executive Officer of First Security.

28.    At all times pertinent to this Complaint, Defendant Donald R. Winton ("Winton") was a resident of Arkansas and served as the First Vice President, Chief Operational Officer, Secretary of Crews and was a member of the Capital Committee of Crews.

29.    Bumpers, DP Crews, Harding, Jack, Jones, Rutledge and Winton (collectively the "Officer and Director Defendants") both individually and collectively, actively participated in the operations of Crews and possessed actual control over the activities of Crews which are the subject of this Complaint.

30.    All of the actions and representations of Crews and Williams alleged throughout this Complaint were directed, authorized and approved by the Officer and Director Defendants acting on behalf of First Security.  Any of such actions that were not directed, authorized and approved by First Security and the Officer and Director Defendants were ratified by First Security and the Officer and Director Defendants.

31.    The Officer and Director Defendants and Williams had a duty to establish and maintain an internal system of control over Crews including, but not limited to,

establishing a capital committee or credit committee comprised of senior management to review each securities transaction where Crews was acting as either an underwriter or as a placement agent and by causing that committee to take reasonable action to ensure that Crews had performed adequate due diligence in accordance with applicable industry standards so that full and fair disclosure would be made to potential purchasers of the securities under review.

## GENERAL ALLEGATIONS APPLICABLE TO ALL CLAIMS FOR RELIEF

### Carter Plantation is a Real Estate Development in Livingston Parish, Louisiana that was Financed with Municipal Bonds and Notes.

32.    Carter Plantation included four phases of home sites, a high density residential area including nine vacation villas comprising 54 rooms, a golf course, a club house, related facilities, land for a hotel and conference center and 117 acres of undeveloped tracks of land.

33.    The success of Carter Plantation and the value of the land in Carter Plantation was tied to the successful completion of the different components of the project. For example, it would be difficult to sell lots to home builders, sell time shares and attract business for a conference center if the golf course was not successful, the marina was not built or the hotel was not built. The financial integrity of the developers of Carter Plantation was also a key to the success or failure of Carter Plantation.

34.    CP Land, L.L.C., a Louisiana limited liability company ("CP Land") was organized in September 2001 to develop Carter Plantation by: acquiring land; constructing a golf course, a club house and related amenities; acquiring the necessary development approvals; constructing the infrastructure; renovating the Carter House; and preparing home sites for sale to home builders.

35.    As of 2005, Brant Enderle and Jim Adair were the managers of CP Land and day-to-day developers of Carter Plantation.

36.    CP Golf, L.L.C., a Louisiana Limited Liability Company ("CP Golf") was organized in 2002 to own and operate the golf course. Brant Enderle and Jim Adair were also the owners and managers of CP Golf as of 2005.

37.    CP Land and CP Golf are affiliates and are referred to collectively as the "Developers."

38.    CP Land caused the Carter Plantation Community Development District to issue over $6 million in bonds in 2004 to finance the construction of improvements to the land. The 2004 bonds were underwritten by Duncan-Williams, Inc., a Memphis, Tennessee based broker-dealer and investment banking firm. Duncan-Williams prepared Official Statements for investors to rely upon when making a decision with regard to purchase of the 2004 Bonds.

39.    CP Land caused the Carter Plantation Community Development District to issue and Crews to act as underwriter for over $16 million in bonds in 2005. Crews prepared Official Statements for investors to rely upon when making a decision with regard to the purchase of the 2005 Bonds.

40.    The Nuveen High Yield Municipal Bond Fund reviewed and relied upon the Official Statements for the 2004 and 2005 Bonds and purchased the entire principal amount of the 2004 and 2005 Bonds.

41.    By 2004, the golf course and country club facilities were complete and open for business. As of 2006, development of phases I and II of Carter Plantation appeared to be proceeding according to plan.

42.    CP Land sold a significant number of lots to home builders.

43.    Principal and interest on the 2004 and 2005 bonds were being paid in accordance with the bond documents.

44.    Hurricane Katrina struck the Gulf Coast on August 29, 2005.

45.    Hurricane Rita struck the Gulf Coast on September 23, 2005.

46.    The hurricanes did not have any substantial negative impact on Carter Plantation.

47.    However, by mid-2006 CP Land, CP Golf and their affiliates Enderle and Adair were encountering serious financial difficulties and were not capable of completing development of the Carter Plantation.

48.    By mid-2006 CP Land and CP Golf were not capable of paying their bills as they became due.

49.    CP Land, CP Golf, Enderle and Adair were concealing these facts from the Nuveen Funds and Pacific.

50.    Sensing impending financial disaster, CP Land, acting through Enderle and Adair, and using Crews as an underwriter and placement agent, decided to try to finance its way out of its problems by raising as much money as possible as quickly as possible through the issuance of the Hotel Bonds, the Taxable Notes and the Marina Bonds.

51.    Between August 2006, when the Hotel Bonds were issued, through June 2007, when the Taxable Notes were issued, and September 2007, when the Marina Bonds were issued, CP Land, CP Golf and their affiliates failed to pay vendors, comingled funds, defaulted on loans, failed to pay employment taxes, submitted sham draw requests,

misappropriated proceeds from the bond issues, and became the subject of lawsuits and lien filings.

### The Official Statements for the Hotel Bonds and Marina Bonds and the PPM for the Taxable Notes Were Required to Contain Full and Fair Disclosure of All Material Facts.

52.     The Hotel and Marina Bonds and the Taxable Notes are securities that were offered and sold to the Nuveen Funds and Pacific. The Official Statements were the disclosure documents for the Hotel Bonds. The PPM was the disclosure document for the Taxable Notes and the LOM was the disclosure document for the Marina Bonds.

53.     The Official Statements for the Hotel Bonds, the PPM for the Taxable Notes and the LOM for the Marina Bonds were required to contain truthful, accurate and complete disclosure of all material facts.

### Crews Had a Duty to Form a Reasonable Basis to Believe in the Accuracy, Truthfulness and Completeness of the Key Representations of CP Land in the Official Statements and PPM.

54.     As underwriter of the 2005 Bonds, Crews, acting primarily through Richard Williams, followed the development of Carter Plantation, knew CP Land and CP Golf were affiliates and knew CP Land and CP Golf were being run by Enderle and Adair.

55.     Crews and Williams knew that the Carter Plantation development was a large and complex project and knew that it would be important to potential purchasers of bonds or notes to be informed if CP Land and CP Golf were encountering financial difficulties, were incapable of completing development of Carter Plantation or were dishonest.

56. As underwriter of the Hotel and Marina Bonds and placement agent for the Taxable Notes, Crews, acting through Williams and others, owed a duty to potential purchasers of those securities, including the Nuveen Funds and Pacific, to:

a) inquire into the accuracy, truthfulness and completeness of the key representations of CP Land that were made in the Official Statements, PPM and LOM;

b) make truthful, accurate and complete disclosure in the Official Statements, PPM and LOM;

c) be skeptical of factual representations made by CP Land, CP Golf, Enderle and Adair;

d) investigate anything that indicated the Official Statements PPM and LOM contained or might contain false or misleading statements of material fact;

e) conduct an independent check of local court records to determine if CP Land and CP Golf were named in any material lawsuits prior to the issuance of the Hotel Bonds, the Taxable Notes and the Marina Bonds;

f) obtain independent confirmation from lenders and vendors that CP Land and CP Golf were current on outstanding loans and financial obligations;

g) carefully review all budgets, appraisals, marketing studies and initial payment requisitions; and

h) take reasonable steps to ensure that the initial expenditure of bond or note proceeds was made in accordance with representations made in the disclosure documents.

56.   For the reasons alleged throughout this Complaint, Crews and Williams did not have any reasonable basis for believing that key representations of CP Land and CP Golf were true and negligently breached each of the above alleged duties.

**CP Land Engaged Crews to Act as Underwriter for the Hotel Bonds.**

57.   In 2006, CP Land sought the issuance of the Hotel Bonds to finance the construction of a new sixty-room hotel facility and conference center, provide surface parking, a fitness center, and support facilities.

58.   CP Land, acting through Enderle and Adair, approached Crews with a proposal to act as the underwriter for the Hotel Bonds.

59.   Crews agreed to underwrite the Hotel Bonds.

60.   With Crews acting as underwriter, the Louisiana Local Government Environmental Facilities and Community Development Authority issued $15 million in Hotel Bonds in August 2006 to pay for construction of a conference center and hotel.

61.   The Hotel Bonds were purchased by certain of the Plaintiffs as specified above.

**Crews Negligently Failed to Disclose that CP Land Defaulted on a Loan and was Named in a Lawsuit Filed by the Lender.**

62.   By mid-2006 CP Land was in default on a $236,000 loan with 20% per annum interest obtained from John David Roberts (the "Roberts Loan").

63.   On August 3, 2006 CP Land's counsel was served with a "Petition to Enforce Note and Mortgage by Ordinary Process" filed by Roberts in the 21st District Court of Livingston Parish, Louisiana on July 31, 2006 (the "Roberts Petition") alleging that CP Land defaulted on a promissory note and mortgage held by Roberts.

64. On August 23, 2006, Enderle caused CP Land to convey approximately twenty-two acres of land that was to be used for the hotel site (the "Hotel Tract") to CP Golf for ten dollars.

65. Enderle then caused CP Golf to fraudulently inflate the purchase price that CP Golf would charge CP Land to repurchase the Hotel Tract.

66. CP Land planned to repay the Roberts Loan and settle the Roberts Petition with proceeds from the Hotel Bonds.

67. CP Land planned to repurchase the Hotel Tract from CP Golf and pay the fraudulently inflated purchase price with proceeds from the Hotel Bonds.

68. The Official Statements for the Hotel Bonds contain a balance sheet and statement of operations for CP Land as of December 2005.

69. The balance sheet and statement of operations portray a solvent development entity that owned land and depreciable assets valued at over $8.5 million with total member's equity of almost $6 million.

70. The Official Statements are misleading because they do not disclose the default on the Roberts Loan and the filing of the Roberts Petition.

71. The Official Statements for the Hotel Bonds are misleading due to the failure to disclose that CP Land transferred title to the Hotel Tract to CP Golf and CP Golf subsequently fraudulently inflated the purchase price.

72. Crews and Williams negligently failed to conduct an adequate search for lawsuits and negligently failed to confirm the status of outstanding loans that were to be repaid with proceeds from the sale of the Hotel Bonds.

73.   Crews and Williams failed to confirm the fair market value of the Hotel Tract.

74.   Crews negligently failed to disclose the above material facts.

**Defendants Negligently Failed to Disclose that CP Golf was Unable to Pay Payroll Taxes for Golf Course Employees.**

75.   The golf course was pledged as collateral for the Hotel Bonds.

76.   Crews, acting primarily through Williams, owed potential bond purchasers, like the Nuveen Funds, a duty to conduct a reasonable investigation into the financial stability of the golf course because the golf course was pledged as collateral for the Hotel Bonds and the success of the golf course was critical to the overall success of Carter Plantation.

77.   By August 2006, CP Golf had failed to pay about $8,000 in payroll taxes to the United States Internal Revenue Service.

78.   As alleged in more detail below, CP Golf continued to fail to pay payroll taxes for the remainder of 2006 and 2007 in an amount that ultimately totaled $210,000.

79.   The Official Statements for the Hotel and Marina Bonds, the PPM for the Taxable Notes and the LOM for the Marina Bonds are all misleading due to the failure to disclose CP Golf's inability to pay its operating expenses, including payroll taxes, and the amount of CP Golf's past due payroll tax obligation to the U.S. Treasury.

80.   Crews and Williams negligently failed to conduct an adequate review of the financial affairs of CP Land and CP Golf and negligently failed to determine that CP Golf was not able to pay its operating expenses.

81.   Crews negligently failed to disclose CP Golf was not paying payroll taxes and was not able to pay its operating expenses.

**Defendants Negligently Failed to Disclose the $1 Million Asset Represented in CP
Land's Financial Statement Attached to the Official Statements Was Impaired**

82.    The above alleged balance sheet and statement of operations reported that
CP Land held a receivable from an affiliate called "CP Leisure" that was worth
approximately $1 million.

83.    CP Leisure was established to sell time-shares at Carter Plantation.

84.    The time share venture was an important component of Carter Plantation.

85.    Crews owed potential purchasers of the Hotel Bonds a duty to conduct a
reasonable investigation into the fair value of the CP Leisure receivable.

86.    David Atkins International ("DAI") acted as a broker with respect to the sale
of time-share units.

87.    The time-share units were originally homes that were to be built and sold
exclusively as time shares.  Eventually CP Leisure explored using existing homes as time
shares.

88.    In June 2006, the Developers entered into a settlement agreement with DAI
terminating their agreement due to poor financial performance of the time-share venture
and the inability of DAI to sell sufficient time-share units.

89.    The approximate $1 million receivable from CP Leisure was substantially
impaired due to the termination of the time share sales agreement with DAI and the poor
performance of CP Leisure.

90.    In addition, CP Leisure did not have any operating income during the time
period leading up to the Hotel Bonds.  It was being funded by other Carter entities
including CP Land and CP Golf.

91. The Official Statement for the Hotel Bonds is false because it valued the CP Leisure receivable at approximately $1 million when it was actually significantly impaired because the stated value of the asset could not be collected.

92. The Official Statements for the Hotel Bonds are misleading due to the failure to disclose the failure of the timeshare venture.

93. Crews, acting primarily through Williams, negligently failed to conduct a reasonable investigation into the accuracy and completeness of the balance sheet and statements of operations, including the fair value of the CP Leisure receivable.

94. Crews negligently failed to disclose the failure of the time share venture and negligently misrepresented that the receivable from CP Leisure was worth approximately $1 million in the Official Statement for the Hotel Bonds.

**Crews Negligently Failed to Disclose that CP Land Planned to Spend a Substantially Greater Amount of Hotel Bond Proceeds on Land and Site Improvements than was Disclosed in the Official Statements.**

95. CP Land prepared budgets for the construction of the hotel and conference center prior to the issuance of the Hotel Bonds.

96. The budgets stated that CP Land would need $3,500,000 to pay off land purchase loans and pay building site improvement costs.

97. Brant Enderle, acting as the manager CP Land, prepared two payment requisitions for land acquisition totaling over $3.5 million in connection with the issuance of the Hotel Bonds.

98. The stated purpose for these requisitions was "acquisition of land on which project will be located."

99.    The payment requisitions were part of the closing documents for the issuance of the Hotel Bonds.

100.    Crews and Williams owed potential purchasers of the Hotel Bonds a duty to obtain and carefully review CP Land's budgets and the payment requisitions to determine how much of the proceeds would be used to pay off land acquisition loans when the Bonds were issued.

101.    A "Market Study" prepared by a consultant, HVS International, was attached as an Appendix to the Official Statements for the Hotel Bonds and reported what was represented to be the estimated budget for the conference center and hotel.

102.    The estimated budget in the Marketing Study falsely represented that land acquisition and site improvement costs were believed to total $900,000 when, in fact, CP Land was actually representing in the budgets and payment requisitions that it would spend $3.5 million on land acquisition without even considering the substantial additional cost of site improvements.

103.    Crews and Williams owed a duty to potential purchasers of the Hotel Bonds to carefully review the Market Study and compare it to the internal budgets and payment requisitions.

104.    Crews owed potential purchasers of the Hotel Bonds a duty to accurately disclose the full amount CP Land represented it would use for the acquisition of land.

105.    The Official Statements for the Hotel Bonds represented that:

> The real property on which the Project will be constructed is currently owned by CP Golf, LLC, which is an affiliate and related person of the borrower. A portion of the proceeds of the Series 2006-A Bonds and a portion of the Series 2006-B taxable bonds are being used by the borrower to

purchase the real property from CP Golf, LLC.

The above representation is misleading due to the failure to disclose that CP Land planned to spend $3.5 million (not something less than $900,000) on the acquisition of land and related costs. The above representation is misleading due to the failure to disclose that CP Land planned to pay the Roberts Loan and settle the Roberts Petition with proceeds from the Hotel Bonds.

106.    Crews, acting primarily through Williams, negligently failed to conduct an adequate review of the budgets, payment requisitions and Marketing Study.

107.    Crews negligently failed to disclose the above material facts.

### Crews Negligently Failed to Disclose that Bond Proceeds Would Not be Sufficient to Build Both the Conference Center and the Hotel.

108.    The "Sources and Uses of Funds" section of the Official Statements for the Hotel Bonds represented that $10,817,452 in bond proceeds would be available to pay for the construction of the conference center and hotel, including land acquisition costs.

109.    The Market Study estimated the total construction cost for the conference center and hotel, including land acquisition costs, site improvements and furniture, fixtures and equipment was $8,411,400.

110.    The $8.4 million construction budget in the Market Study left about $2.4 million of additional bond proceeds available to pay unforeseen budget over-runs.

111.    Crews and Williams owed a duty to potential bond purchasers to independently confirm that bond proceeds were reasonably expected to be sufficient to complete construction of the conference center and hotel based upon what was known about construction costs when the Hotel Bonds were issued.

112.    The Official Statement for the Hotel Bonds represented that:

> The Borrower can give no assurance that the development and construction of the Project will be accomplished on schedule or within budget. The failure to complete or a delay in the Project, or an increase in the cost to the Borrower for the development and construction of the Project, or both, may adversely affect the receipt of Revenues as projected.

113.   The Market Study stated as follows with respect to the construction budget:

> This budget was for a single building housing both the 60 guest rooms and the conference center. The plan has changed to include separating the hotel building from the conference center building and building on two sites instead of one. As the plans evolve there may be many changes in the construction cost budget.

114.   The above representations in the Official Statements and Market Study were misleading due to the failure to disclose the internal budgets and payment requisitions both stated land acquisition costs were really $3.5 million, not something less than the $900,000 set forth in the Market Study for both land acquisition and site improvements.

115.   The Official Statements and Market Study are both misleading due to the failure to disclose that, with the expenditure of $3.5 million for land acquisition, the $10.8 million allocated for construction of the hotel and conference center was already insufficient to build both the conference center and the hotel without considering what were anticipated to be substantial site improvement costs.

116.   The Official Statements are misleading due to the failure to disclose the $3.5 million expenditure for land acquisition left no money in the construction budget for site improvements.

117.    Crews negligently failed to disclose all the above material facts.

118.    The Nuveen Funds reviewed and reasonably relied upon the Official Statements for the Hotel Bonds and would not have purchased the Hotel Bonds if any of the above material facts had been disclosed to them.

**Crews Negligently Failed to Disclose that CP Land Planned to Use Substantial Portions of the $3.5 Million Allocated for the Purchase of the Land for Things That Were Unrelated to Construction of the Conference Center and Hotel.**

119.    Even though the internal budgets and initial payment requests stated that the $3.5 million dollars would be allocated to the purchase of land, CP Land actually planned to use substantial portions of the $3.5 million on things that were unrelated to the acquisition of the Hotel Tract or the construction of the conference center and hotel.

120.    CP Land, for example, planned to and did transfer over $550,000 in proceeds from the initial payment requests directly to CP Golf to fund operation of the golf course.

121.    CP Land also used approximately $320,000 of the Bond proceeds repay the Roberts Loan and settle the Roberts Petition.

122.    Approximately $2,500,000 of the proceeds from the Hotel Tract repurchase was used to repay existing debt with First Bank and McComb to release the bank's security interest on the Hotel Tract.

123.    State Bank was paid approximately $100,000 on an existing equipment loan from the Bond proceeds.

124.    Crews and Williams owed a duty to potential purchasers of the Hotel Bonds, including the Nuveen Funds and Pacific, to determine how CP Land actually planned to spend the $3.5 million it would be paid through the initial payment requests.

125.   The Official Statements for the Hotel Bonds are misleading not only because they failed to disclose that, as alleged above, the initial payment requests for the purchase of the Hotel Tract totaled $3.5 million but also due to the failure to disclose that CP Land had plans to spend substantial portions of the $3.5 million on things other than the purchase of the Hotel Tract or construction of the conference center and hotel.

126.   Crews negligently failed to disclose that CP Land planned to spend substantial portions of the $3.5 million dollars it was to receive through the initial payment requests on things other than the purchase of the Hotel Tract or construction of the conference center and hotel.

### CP Land and CP Golf Defaulted on a Massive Amount of Loans, Were not Paying Payroll Taxes and Were Misappropriating Money From the Hotel and Conference Center Project.

127.   In September 2006, the food and beverage director for Carter Plantation, Missy Lavelle, personally covered two of CP Golf's non-sufficient funds checks that totaled $12,826.

128.   Lavelle entered into an agreement with CP Golf for reimbursement for the $12,826.  CP Golf failed to timely reimburse Lavelle for her out-of-pocket expenses pursuant to the terms of the agreement.

129.   By September 2006, CP Golf's unpaid payroll taxes had climbed to over $50,000.

130.   In November 2006, Enderle caused CP Land to submit a sham $400,000 requisition to pay a vendor, United-1 Construction.

131.   Regions Bank, the trustee for the Bonds, paid $400,000 to United-1 Construction on December 1, 2006.  United-1 Construction apparently then kicked back the $400,000 to CP Land for "professional services rendered."

132.   CP Land did not provide any substantial "professional services" worth anywhere close $400,000 to United-1 Construction.

133.   In December 2006, CP Land deposited $200,000 in a bank account with a notation that the funds had been received from United-1 Construction.

134.   In December 2006, CP Land received a $10,325 past due notice on a $300,000 loan from First Bank & Trust with late charges of $2,400.

135.   By December 2006, CP Golf's unpaid payroll taxes exceeded $150,000.

136.   In January 2007, CP Land received notice from the CMP Family, LLC that an event of default had occurred because CMP paid $360,426 on behalf of CP Land on three First Bank and Trust promissory notes and, as a result, the entire $6,500,000 principal amount of CMP's loan to the Developers was now due and payable.

137.   In March 2007, CP Land received a letter from Central Progressive Bank stating that a real estate loan with a balance of $403,606 was "seriously past due."

138.   In March 2007, the Developers received a past due notice from First Guaranty Bank for the full principal amount due of $449,555 plus interest and late fees.

139.   In April 2007, CP Land received a past due notice from State Bank & Trust on a loan with a principal amount owed of $1,010,440.

140.   In April 2007, CP Land received a past due notice from State Bank & Trust on the entire principle and interest due on a loan totaling $617,609.

141.   By June 2007, the Developers were at least $1.5 million behind in payments on the above alleged loans.

142.   In June 2007, CP Land submitted a draw request to the trustee for the Hotel Bonds for bunker sand for the golf course in the amount of $22,200.

143.   CP Land submitted five draw requests totaling $97,931 to the trustee of the Hotel Bonds for administrative management expenses for multiple entities, including CP Golf and Village Creek, a golf course controlled by Enderle and Adair in Arkansas. These draw requests were submitted over the period of July 2008 to September 2008 for reimbursement of administrative management expenses incurred from January 2007 to September 2008.

144.   In July 2008, CP Land submitted a $13,900 draw request to the trustee for the Hotel Bonds for reimbursement to CP Land for an audit not relating to the hotel or conference center which was supported by an August 2007 invoice.

**Defendants Negligently Failed to Disclose the Massive Loan Defaults and Sham Draw Requests in the Private Placement Memorandum for the Taxable Notes.**

145.   CP Land approached Crews seeking the issuance $10,655,000 in Taxable Notes to finance their way out of these serious loan defaults.

146.   Crews agreed to act as placement agent for the Taxable Notes.

147.   Crews prepared an eleven-page Private Placement Memorandum (the "PPM"). The Official Statements for the 2004 and 2005 Bonds and the Official Statements for the Hotel Bonds were attached as Appendices to the PPM. The Official Statements for the Hotel Bonds continued to be false and misleading for all the above alleged reasons. As a result, the PPM was false and misleading.

148.     The PPM represented that the Notes were "being issued by the Company to refinance and consolidate currently outstanding obligations" related to Carter Plantation.

149.     The "Sources and Uses of Funds" section of the PPM identified over $9.5 million in loans obtained by CP Land that would be paid off with proceeds from the Taxable Notes. The lenders to be paid off included 1st Bank of McComb, First Guaranty Bank, State Bank & Trust, Central Progressive Bank, David Atkins International and the CMP Family.

150.     The PPM is misleading because it failed to disclose all of the above alleged material facts, failed to disclose the default status of the above alleged loans and failed to disclose that CP Land and CP Golf were submitting sham payments requests, were diverting construction funds for the conference center and hotel to pay for operation and maintenance of the golf course and expenses for a project located in another state.

151.     Crews and Williams owed a duty to potential purchasers of the Notes, including the Nuveen Funds and Pacific, to independently verify and report the payment status of each of the loans to be paid off with proceeds form the Taxable Notes.

152.     Crews and Williams negligently failed to verify the payment status of said loans.

153.     Crews and Williams owed a duty to potential purchasers of the Taxable Notes, including the Nuveen Funds and Pacific, to review the payment requests submitted by CP Land for the construction of the conference center and hotel to ensure that proceeds from the Hotel Bonds were being properly expended for those construction projects.

154.     Crews and Williams owed a duty to potential purchasers of the Taxable Notes to review the books and records of CP Land and CP Golf to determine whether they were timely paying their bills and taxes.

155.     The Taxable Notes were issued on June 8, 2007 and were offered to the Nuveen Funds by Crews.

156.     As alleged above, certain Nuveen Funds reviewed and reasonably relied upon the PPM and purchased the entire principal amount of the Notes.

157.     The Nuveen Funds would not have purchased the Taxable Notes if any of the above alleged material facts had been disclosed to them.

### Defendants Negligently Failed to Disclose Material Facts in the Limited Offering Memorandum for the Marina Bonds.

158.     The U.S. Department of Treasury filed a $211,847 tax lien on the golf course on September 10, 2007.

159.     By September 2007, CP Land owed vendors approximately $400,000 that it could not pay.

160.     The Developers were also unable to pay a mortgage on one sales office and rent on another sales office.

161.     Despite the impending failure of Carter Plantation, CP Land approached Crews to finance the development of the Carter Marina project through the issuance of even more bond debt.

162.     Crews agreed to act as underwriter for $13,695,000 in face value of Marina Bonds that were issued in September 2007.

163.     As underwriter, Crews prepared a prospectus it called a "Limited Offering Memorandum" ("LOM").

164.   Crews owed a duty to potential purchasers of the Marina Bonds to disclose all of the above alleged material facts in the LOM.

165.   All of the above alleged material facts that were misrepresented or were not disclosed in the Official Statements for the Hotel Bonds and the PPM for the Taxable Notes should have been known to Crews and Williams before the Marina Bonds were issued.

166.   Crews and Williams negligently failed to conduct an adequate search for liens and negligently failed to confirm the payment status of vendors before the Marina Bonds were issued.

167.   The LOM for the Marina Bonds was misleading due to the failure to disclose all of the above alleged material facts that showed CP Land was totally incapable of completing development of Carter Plantation, had been concealing the failure of the golf course, had insufficient funds to complete construction of the hotel, had defaulted on a massive amount of loans, was incapable of paying its bills as they became due and had been misappropriating proceeds from the Hotel Bond issue.

168.   As alleged above, certain Nuveen Funds reviewed and reasonably relied upon the LOM in purchasing the entire principal amount of the Marina Bonds.   The Nuveen Funds would not have purchased the Marina Bonds if any of the above material facts had been disclosed to them.

**First Security and the Officer and Director Defendants Negligently and Recklessly Failed to Monitor the Underwriting Activities of Crews and Williams with Respect to the Hotel Bonds, the Taxable Notes and the Marina Bonds.**

169.    First Security, as the sole shareholder of Crews, elected the board of directors of Crews and directly and indirectly controlled all of the activities of Crews that are the subject of this Complaint.

170.    The Officer and Director Defendants had a duty to members of the investing public to take reasonable actions to ensure that Crews established and actually utilized adequate policies and procedures to control the underwriting and due diligence activities of investment bankers, such as Williams.

171.    First Security and the Officer and Director Defendants, collectively and individually, both negligently and recklessly, failed to take reasonable actions to ensure that Crews established and enforced adequate policies and procedures designed to control the underwriting and due diligence activities of its investment bankers, including Williams.

### Following the Issuance of the Marina Bonds, CP Land Continued to Misappropriate Hotel Bond Proceeds and, Along with CP Golf, Became the Target of Lawsuits.

172.    In January 2008, CP Land submitted a sham payment request to the trustee for the Hotel Bonds to pay architect Gasaway-Gasaway-Bankston $144,875.

173.    Based on the bank accounts and bank statements identified, the proceeds from the payment request apparently were not passed along to Gasaway-Gasaway-Bankston, but instead, were used to pay CP Golf operating expenses.

174.    In April 2008, Central Progressive Bank filed suit against the Developers for an unpaid mortgage in the amount of $406,193.18.

175.    In June 2008, Anh Bui filed suit against CP Golf for $70,125.05 in past due rent on a real property lease in Springfield, Louisiana.

176.    In June 2008, Patricia Bacall and Cyprus Bluff filed suit against CP Land for $464,496.08 in past due rent.

177.    In August 2008, CP Land submitted another sham draw request to the trustee for the Hotel Bonds to pay a vendor, Easterly Construction Company, $192,000. Based on the bank accounts and bank statements identified to date, rather than pay Easterly Construction Company, Enderle transferred all but $2,000 of this amount into his personal checking account.

178.    In September 2008, CP Land submitted a sham draw request to the trustee for the Hotel Bonds to pay Watco Contractors $439,480.00.   It appears that only $37,480.00 of the draw request was actually paid to Watco, based on the bank accounts and bank statements identified.  CP Land used the remaining amount to pay back-taxes to the State of Louisiana.

179.    CP Golf failed to pay the Livingston Parish School District $130,983.54 in taxes and a lien was filed.

**Nuveen Learned of CP Land's Inability to Complete Construction of the Hotel in October and November 2008 and the Carter Plantation Development Failed.**

180.    In October 2008, Enderle informed the Nuveen Funds and Pacific that debt service reserve funds would have to be used to meet the November payments on the 2004 and 2005 Bonds and on the Hotel Bonds.

181.    In November 2008, Enderle told the Nuveen Funds and Pacific that they could not build the hotel with the amounts remaining in the construction fund and were over budget by approximately $2,000,000.

182. In November 2008, Enderle also notified the Nuveen Funds and Pacific that, given the financial situation, CP Land could not continue development of Carter Marina.

183. Enderle attributed the problems at Carter Plantation to the decline in the national economy.

184. Carter Plantation was already facing economic disaster due to the incompetence and dishonesty of CP Land and CP Golf, Enderle and Adair long before the national economic decline caused further economic deterioration at Carter Plantation.

185. As alleged above, certain Nuveen Funds sold the Marina Bonds back to Crews on December 23, 2008 for substantially less than their face value.

186. The Nuveen Funds and Pacific still own the Hotel Bonds and Taxable Notes.

187. The failures to disclose the above alleged material facts regarding the dishonesty of CP Land, CP Golf, Enderle and Adair, the severe financial instability of CP Land and CP Golf and the inability of CP Land and CP Golf from and after early 2006 to develop Carter Plantation in accordance with representations made to the Nuveen Funds and Pacific in the Official Statements, PPM and LOM were all substantial causes of the failure of Carter Plantation.

188. As a direct and proximate result of the wrongful conduct alleged throughout this Complaint, the Nuveen Funds and Pacific are entitled to rescission and have otherwise suffered damages in an amount which is presently unknown, but which is estimated to consist of a substantial portion of the principal amount of the Hotel Bonds

and Taxable Notes and the losses suffered when the Marina Bonds were sold back to Crews.

189.    On September 22, 2009, in compliance with Section 12(A)(1) of Illinois Securities Law (§815 ILCS 5/13(B)), the Nuveen Funds and Pacific provided Crews with formal written notice of the Nuveen Funds and Pacific's demand to void and rescind their purchase of the Bonds and receive repayment of any accrued and unpaid interest and any other relief available under applicable law.

### FIRST CLAIM FOR RELIEF
### (Arkansas Securities Act)

190.    Plaintiffs repeat the allegations of all preceding paragraphs of this Complaint and incorporate the same by reference.

191.    Defendant Crews sold the Hotel and Marina Bonds and offered the Taxable Notes for sale to the Plaintiffs in violation of Arkansas Securities Act § 23-42-106(a)(1)(B).

192.    Defendant Crews sold the Hotel and Marina Bonds to Plaintiffs and offered the Taxable Notes to Plaintiffs by means of untrue statements of material fact, or failures to disclose material fact, which material facts were necessary in order to make the statements made in connection with those offers and sales not misleading in light of the circumstances under which those statements were made.

193.    Defendant Williams performed functions similar to an executive officer and director of Crews and was an employee of the seller who materially aided in the sale of the Hotel and Marina Bonds and Taxable Notes to the Nuveen Funds and Pacific and thus within the meaning of Arkansas Securities Act § 23-42-106(c).

194.    Defendant First Security directly or indirectly controlled Crews within the meaning of the Arkansas Securities Act § 23-42-106(c).

195.    As officers and directors of Crews, Defendants Bumpers, Crews, Harding, Jack, Jones, Rutledge, Winton and Williams are liable jointly and separately with Crews pursuant to Arkansas Securities Act § 23-42-106(c).   Defendants Bumpers, Crews, Harding, Jack, Jones, Rutledge, Winton and Williams also directly and indirectly controlled Crews and materially aided in the sale of the Hotel and Marina Bonds and Taxable Notes within the meaning of Arkansas Securities Act § 23-42-106(c).

196.    As a direct and proximate result of the wrongful conduct of the Defendants, the Plaintiffs have suffered damages.

## SECOND CLAIM FOR RELIEF
### (Louisiana Securities Law)

197.    Plaintiffs repeat the allegations of all preceding paragraphs of this Complaint and incorporate the same by reference.

198.    Defendant Crews sold the Hotel and Marina Bonds and offered the Taxable Notes to the Plaintiffs in violation of Louisiana Securities Law §§ 51:712(A)(2) and 51:714(A).

199.    Defendant Crews sold the Hotel and Marina Bonds and offered the Taxable Notes to the Plaintiffs by means of untrue statements of or failures to disclose material facts, which material facts were necessary in order to make the statements made in connection with those offerings and sales not misleading in light of the circumstances under which those statements were made.

200.    Defendant Williams performed functions similar to an executive officer and director of Crews and was a salesman who participated in a meaningful way in the

sale of the Hotel and Marina Bonds and Taxable Notes to the Nuveen Funds and Pacific within the meaning of the Louisiana Revised Statutes § 51:714(B).

201. As the sole shareholder of Crews, Defendant First Security directly or indirectly controlled Crews within the meaning of the Louisiana Revised Statutes § 51:714(B).

202. As officers and directors of Crews, Defendants Bumpers, DP Crews, Harding, Jack, Jones, Rutledge, Winton and Williams, directly and indirectly controlled Crews within the meaning of the Louisiana Revised Statutes § 51:714(B) and participated in a material way in the sale of the Hotel and Marina Bonds and Taxable Notes.

203. The Plaintiffs did not know of the untruths or omissions.

204. As a direct and proximate result of the wrongful conduct of the Defendants, the Plaintiffs have suffered damages.

## THIRD CLAIM FOR RELIEF
### (The Illinois Securities Law)

205. Plaintiffs repeat the allegations of all preceding paragraphs of this Complaint and incorporate the same by reference.

206. Defendant Crews sold the Hotel and Marina Bonds and offered the Taxable Notes to the Plaintiffs in Illinois in violation of 815 ILL. COMP. STAT. 5/12 and 5/13 (2006).

207. Defendant Crews, in connection with the Plaintiffs' purchases of the Hotel and Marina Bonds and the Taxable Notes, obtained money from the Plaintiffs through the sale of securities in Illinois by means of untrue statements of material fact or omissions to state material fact necessary in order to make the statements made, in light of the

circumstances under which those statements were made, not misleading in violation of 815 ILL. COMP. STAT. 5/12 (G)(2006).

208.   Defendant Crews, in connection with the Plaintiffs' purchases of the Hotel and Marina Bonds and the Taxable Notes, circulated a statement, prospectus or other paper having reasonable grounds to know that material representations therein contained to be false or untrue in violation of 815 ILL. COMP. STAT. 5/12(H)(2006).

209.   As officers and directors of Crews, Defendants Bumpers, DP Crews, Harding, Jack, Jones, Rutledge, Winton and Williams, directly and indirectly controlled Crews within the meaning of 815 ILL. COMP. STAT. 5/2.4, 5/12 and 5/13 (2006) and participated in a material way in the sale of the Hotel and Marina Bonds and Taxable Notes.

210.   Defendants were in the business of providing information of the type Plaintiffs relied upon.

211.   Plaintiffs reasonably relied upon the information provided by Defendants.

212.   Defendant Williams performed functions similar to an executive officer and director of Crews and was a salesman who participated in a meaningful way in the sale of the Hotel and Marina Bonds and Taxable Notes to the Nuveen Funds and Pacific within the meaning of the Illinois Securities Law.

213.   As a direct and proximate result of the wrongful conduct of the Defendants, the Plaintiffs have suffered damages.

## FOURTH CLAIM FOR RELIEF
### (Common Law Negligent Misrepresentation – Defendants Crews and Williams)

214.   Plaintiffs repeat the allegations of all preceding paragraphs of this

Complaint and incorporate the same by reference.

215.     Defendants Crews and Williams had a duty to disclose or cause to be disclosed to potential purchasers of the Hotel and Marina Bonds and Taxable Notes, including the Plaintiffs, the material facts set forth hereinabove.  Defendants Crews and Williams had a duty to take reasonable actions to ensure that the representations made in the Official Statements, PPM and LOM were truthful and not misleading.

216.     Defendants Crews and Williams breached their duty to the Plaintiffs by negligently or carelessly making the misrepresentations of material facts and failing to disclose material facts as set forth hereinabove.

217.     Plaintiffs took action in reliance upon the misrepresentations and failures to disclose of Defendants Crews and Williams.

218.     Defendants Crews and Williams knew that the information in the Official Statements, PPM and LOM would be relied upon by the Plaintiffs.

219.     As a direct and proximate result of the negligent misrepresentations and omissions of Defendants Crews and Williams, the Plaintiffs have suffered damages.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for rescission and, in the alternative, for recovery of compensatory damages and punitive damages, together with reasonable attorney fees, interest and costs.

### JURY DEMAND

Plaintiffs request trial by jury of all claims that can be so tried.

EMERSON POYNTER, L.L.P.


Scott E. Poynter
The Museum Center
500 President Clinton Avenue, Suite 305
Little Rock, AR 72201
Telephone: (501) 907-2555
Fax: (501) 907-2556

DAVIS & CERIANI, P.C.

**/s/ Michael P. Cillo**
Michael P. Cillo (Petition for Admission To Be
Filed)
Melissa J. Hessler (Petition for Admission To Be
Filed)
1350 Seventeenth Street, Suite 400
Denver, CO 80202
Telephone: (303) 534-9000
Facsimile: (303) 534-4618

-and-

SHER GARNER CAHILL RICHTER KLEIN &
HILBERT, L.L.C.

**s/ James M. Garner**

JAMES M. GARNER E.D. Ark. Bar No. 19589
JOHN T. BALHOFF, II
JENNIFER M. HOFFMAN
909 Poydras Street, Twenty-eighth Floor
New Orleans, Louisiana  70112
Telephone: (504) 299-2100
Facsimile: (504) 299-2300

Attorneys for Plaintiffs